# DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

**JABARI KEMP,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-3472

[May 8, 2019]

### *ON SECOND AMENDED MOTION FOR REHEARING*

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John S. Kastrenakes, Judge; L.T. Case No. 502013CF006185A.

Carey Haughwout, Public Defender, and Karen E. Ehrlich, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Allen R. Geesey, Assistant Attorney General, West Palm Beach, for appellee.

TAYLOR, J.

We grant appellant's Second Amended Motion for Rehearing, withdraw our previous opinion, and substitute the following in its place.

Appellant, Jabari Kemp, appeals his convictions for five counts of vehicular manslaughter. The charges stemmed from an automobile crash that resulted in the tragic deaths of five young people. At trial, the principal issue was whether appellant operated "a motor vehicle . . . in a reckless manner likely to cause the death of, or great bodily harm to, another." § 782.071, Fla. Stat. (2012). A key factual dispute on this issue was whether appellant was in control of the car at the time of the crash. To prove this disputed element, the State relied on expert opinion testimony that appellant had applied the brakes before the crash. The expert's braking opinion was based solely on his visual observation of

crush damage to the victims' car.

We reverse and remand this case with directions to the trial court to conduct a *Frye*[1] hearing to determine the admissibility of this expert opinion testimony. *See DeLisle v. Crane Co.*, 258 So. 3d 1219, 1229 (Fla. 2018) (reaffirming that *Frye* is the appropriate standard in Florida for the admissibility of expert testimony on new or novel scientific evidence); *D.R. Horton, Inc. - Jacksonville v. Heron's Landing Condo. Ass'n of Jacksonville*, 44 Fla. L. Weekly D109, D111 (Fla. 1st DCA Dec. 27, 2018) (applying *DeLisle* on appeal in reviewing the admissibility of expert opinions that the trial court admitted at trial pursuant to *Daubert* and section 90.702).[2]

On the night of the accident, appellant was driving a Mercedes coupe northbound on I-95 and exited at Blue Heron Boulevard. According to the lead accident investigator, the curvature of the Blue Heron exit "would require a person to make their vehicle maneuver in such a way to make that curve."

Appellant's car sped down the exit ramp and ran the red light at the end of the ramp. The car continued straight into the perpendicular lanes of traffic and crashed into the side of a Lexus sedan that was proceeding eastbound with the green light. The State presented expert testimony that appellant's vehicle impacted the Lexus at about 128 mph. Both cars went across the median and came to rest beyond the westbound lanes of traffic.

When paramedics arrived, appellant was awake but was "mostly in and out of consciousness." Appellant had to be extricated from his vehicle.

The five young people in the Lexus died as a result of the accident.

One of the key factual disputes at trial was whether appellant had lost consciousness shortly before the crash. The State was required to prove at trial that appellant operated his motor vehicle "in a reckless manner likely to cause the death of, or great bodily harm to, another," which is a

---

[1] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[2] In *D.R. Horton*, however, the First District did not remand for a *Frye* analysis, emphasizing that "the trial court, albeit in the context of its *Daubert* analysis, found that Appellee's experts used a scientifically reliable and peer-reviewed methodology that was the industry standard." 44 Fla. L. Weekly at D111. By contrast, in this case, we find it necessary to remand for a *Frye* analysis.

required element of vehicular homicide.[3]  However, evidence that a defendant merely lost control of a vehicle is insufficient, without more, to prove reckless driving.  *Smith v. State*, 218 So. 3d 996, 998 (Fla. 2d DCA 2017).

Appellant's defense was that he fainted at the wheel and did not have control over the car at the time of the collision.  He testified that he felt "very faint" about "a second or two" into the Blue Heron exit from I-95.  He explained that he had never fainted before and did not know he was going to pass out.  He recalled driving 65 to 70 mph before he lost consciousness.  The next thing he remembered was waking up at the hospital.

Defense counsel argued that appellant's height and manner of sitting in the Mercedes likely caused appellant's foot to press on the gas pedal after he passed out.  According to defense counsel, this would explain how the vehicle could have gotten up to 128 mph as appellant exited I-95.  Appellant testified that he was 5'11", that his Mercedes sports car sat "kind of low," and that the gas pedal was "very responsive."

An eyewitness described seeing appellant's car coming down the off-ramp: "It was a flying like it was – it was like somebody was unconscious in the car just going, [vroom].  It was – I thought it was flying because it wasn't turning, it was just going straight.  It was just, like – like a plane diving."  According to this witness, appellant's car was not braking.

A police officer at an unrelated traffic stop about 400 feet away from the accident "heard the sound of tires screeching on a highway effectively applying brakes and then I heard a large pop or a bang which was indicative of a collision having occurred."  However, the officer did not see

---

[3] Vehicular homicide is defined as "the killing of a human being . . . caused by the operation of a motor vehicle by another in a reckless manner likely to cause the death of, or great bodily harm to, another."  § 782.071, Fla. Stat. (2012).  Vehicular homicide therefore requires proof of reckless driving—that is, driving with a "willful or wanton disregard for the safety of persons or property." *Santisteban v. State*, 72 So. 3d 187, 195 (Fla. 4th DCA 2011) (citations and internal quotation marks omitted).  "Willful" means "intentional, knowing, and purposeful," and "wanton" means with a "conscious and intentional indifference to consequences and with knowledge that damage is likely to be done to persons or property." *Lewek v. State*, 702 So. 2d 527, 530–31 (Fla. 4th DCA 1997) (citations and internal quotation marks omitted).  "In determining whether a defendant was driving recklessly, the essential inquiry is whether the defendant knowingly drove the vehicle in such a manner and under such conditions as was likely to cause death or great bodily harm." *Santisteban*, 72 So. 3d at 195.

the accident, nor did he know which car made the screeching sound.

Corporal Johnson was the lead investigator in the case.  He testified that he did not see any roadway tire marks indicating that appellant was braking immediately before the crash.  He was assisted by Corporal Dooley, who performed the speed calculations.

Both issues on appeal arise from Corporal Dooley's testimony.  Over appellant's *Daubert*[4] objection and another objection to an alleged discovery violation,[5] the trial court admitted Dooley's opinion that the damage to the Lexus indicated that appellant was braking his vehicle as the collision occurred.

Dooley inspected the vehicles after the accident for "crush damage," mechanical defects, tire malfunction, and damage profiles.  Damage profiles show the angle of approach from the vehicle, how far the crush went into the vehicle, and the angle of departure.

Dooley claimed that sometimes there is damage that indicates whether braking occurred at the point of impact between two cars:

> [CORPORAL DOOLEY:] When you have two cars that are relatively similar in height . . . , as somebody is approaching a car . . . they are not paying attention or whatever it is, and at the last second they brake right before impact.  And the front end will dip and it will go down and it will smack the rear of the car or whatever the case is.  Normally, that's from you're traveling at a speed and as you hit the brakes, center mass, the momentum is going forward so it's going to push that momentum forward causing the front end to dip.  I'm sure we have all done it, whether you accelerate and the front end goes up, or you hit the brakes and the front end goes down, but that's what we are looking for is how up the damage profile is.  . . .  What we have here is, up to here this is the right rear passenger door of the Lexus.  And as you can see here, it's kind of bowed out a little bit, and then when you look further down you notice how it appears to get deeper and deeper and deeper.  When you get down to the bottom of it that's the frame right there, okay?  So when you look at this damage profile

---

[4] *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

[5] We affirm without further comment as to appellant's argument that he was procedurally prejudiced by the State's discovery violation.

this to me is obviously a significant impact. But when you have all of this up here, which is kind of in line with whatever the car may or should have been, and then as you start looking down, down, down, it starts to get deeper and deeper and deeper as you get down to the –

At this point, the defense objected, and the court permitted voir dire before Corporal Dooley rendered his opinion:

[CORPORAL DOOLEY]: Well, when you have such a tremendous speed going down and so much energy and momentum, the car is -- if it's not dipping, or going up, or accelerating, it's going straightforward. Whatever it's going to hit and when it hits you would have the crushing factor. It would be more upright but, again, like I said, when I see this based on everything I've seen in the past, all my training and experience, it shows me that the car hits and goes down, is what it tells me. That's all I can testify to. That's what it tells me is that it hits but it's going down.

THE COURT: And that is consistent within a reasonable degree of scientific certainty with braking of the Mercedes?

[CORPORAL DOOLEY]: I can't tell you about the scientific -- or anything about the braking of the Mercedes. What I can tell you is the overall dynamics of a car to require to have shocks and struts and all these things and if you are accelerating, the front will go up. If you are decelerating it goes down -- that's all I can -- I'm just telling you what it means to me.

THE COURT: Is it consistent with braking?

[CORPORAL DOOLEY]: Yes.

THE COURT: Is it consistent with any other scenario other than braking?

[CORPORAL DOOLEY]: I, personally, cannot think of anything that it would be consistent with --

THE COURT: Okay.

[PROSECUTOR]: If I could ask him one additional question. . .

. . When the Judge asked you if it's within a degree of scientific certainty, when we talk about science what you are discussing deals with a car going downward, deals with the laws of physics and momentum, correct?

[CORPORAL DOOLEY]: Yes, ma'am.

[PROSECUTOR]: Okay. And that would be science?

[CORPORAL DOOLEY]: Yes, ma'am. . . .

[DEFENSE COUNSEL]: Are there any studies on this dipping effect, the curling downward?

[CORPORAL DOOLEY]: I'm sure that there are but I can't quote anything specific.

[DEFENSE COUNSEL]: None that you have read?

[CORPORAL DOOLEY]: Yes, we've actually -- when we go out and we do a lot of these more specific schools, like I testified to earlier . . . that I've attended, we go out and we will crash vehicles, we will throw motorcycles off the back of trucks and watch them spin, **but to classify like as actually studying I personally cannot recall anything specific dealing with it**. Other than talking about momentum in general when weights are transferred from the center mass forward because that's where the momentum was going. And as they apply the brakes, the momentum shifts forward, and as you accelerate, the momentum shifts backwards, talking about dynamics of how cars work. But as far as quoting an actual case study or a doctor or scientist or whomever may have been out there looking at it, I can't tell you.

[DEFENSE COUNSEL]: Okay. And that would have nothing to do with the fact that the Lexus was a heavier vehicle at the time?

[CORPORAL DOOLEY]: Heavier vehicle and damage profile, I can't see any type of issue with that but it just appears like I said this, I'm just testifying as to what this looks like to me --

[DEFENSE COUNSEL]: Okay. Thank you. . . .

6

THE COURT: Corporal, is this -- is this type of downward arc in damage something that is taught at you know accident reconstruction classes that you have done?

[CORPORAL DOOLEY]: There are examples that are given. Unfortunately, you can't cover every single type of scenario that a crash will happen in, but no there are examples given and again explain to you how when a vehicles weight shifts and different things like that and we learn about speed calculations if a car swerved to avoid and all of the load goes to one side, and it will leave a tiny thin mark. We learn about weight transfer and momentum transfer, and then we go into when vehicles collide with others and how they transfer their momentum or kinetic energy to the other vehicle. But we do learn about these things, but I can't quote you anything specific off the top of my head as to a case study or somebody who is in the know, specifically.

(Emphasis added).

The trial court ruled that Dooley's braking opinion was admissible under *Daubert*.

Dooley then testified that the crush damage to the Lexus went downward in "an arc-type fashion," which indicated that the front end of appellant's car was dipping as it was colliding with the Lexus. If a car is dipping, Dooley explained, this indicates "that there is some type of braking or driver input." Dooley asserted that if appellant's vehicle had not been dipping, there would have been "more of a flatter type crush pattern." Dooley claimed that the damage to the Lexus starts at the normal height one would expect, but arcs downward. According to Dooley, it was the arc of the damage to the Lexus—not its height from the ground— that was indicative of dipping.

The jury found appellant guilty as charged on all five counts. The court granted a downward departure and sentenced appellant to five consecutive terms of six years in prison, for a total of 30 years in prison.

On appeal, appellant initially argued that Dooley's testimony did not meet the requirements of section 90.702, Florida Statutes (2015), and *Daubert*. However, after the Florida Supreme Court declined to adopt the "*Daubert* Amendment" to the evidence code, *see In re Amendments To Florida Evidence Code*, 210 So. 3d 1231, 1235–39 (Fla. 2017), appellant filed a supplemental brief arguing that Dooley's testimony did not satisfy

the *Frye* standard.

Notably, at the time of trial in 2015, the extant case law held that the *Daubert* Amendment to section 90.702 applied to pending cases. *See Perez v. Bell S. Telecomm., Inc.*, 138 So. 3d 492, 498 (Fla. 3d DCA 2014) (holding that the 2013 revision to section 90.702 should be applied retrospectively to pending cases); *see also Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992) (explaining that "in the absence of interdistrict conflict, district court decisions bind all Florida trial courts").

In *DeLisle*, however, the Florida Supreme Court reaffirmed that the standard for admissibility of expert testimony is controlled by *Frye*, not *Daubert*. 258 So. 3d at 1229. The court declared: "This rule—that expert testimony should be deduced from generally accepted scientific principles—has been the standard in Florida cases and, today, we reaffirm that it is still the standard." *Id.* at 1225. The court held that section 90.702, as amended in 2013, is procedural, and that the Legislature infringed on the court's rulemaking authority when it enacted the amended statute. *Id.* at 1229. The court held that the statute was unconstitutional. *Id.*

Under Florida's "pipeline rule," the "disposition of a case on appeal should be made in accord with the law in effect at the time of the appellate court's decision rather than the law in effect at the time the judgment appealed was rendered." *N. Broward Hosp. Dist. v. Kalitan*, 174 So. 3d 403, 412 (Fla. 4th DCA 2015) (quoting *Hendeles v. Sanford Auto Auction, Inc.*, 364 So. 2d 467, 468 (Fla. 1978)). Accordingly, we apply the requirements of *DeLisle* here.

The *Frye* standard "only applies when an expert attempts to render an opinion that is based upon new or novel scientific techniques." *U.S. Sugar v. Henson*, 823 So. 2d 104, 109 (Fla. 2002). "[T]he *Frye* test is utilized in Florida to guarantee the reliability of new or novel scientific evidence." *Brim v. State*, 695 So. 2d 268, 271 (Fla. 1997).

"This standard requires a determination, by the judge, that the basic underlying principles of scientific evidence have been sufficiently tested and accepted by the relevant scientific community." *Id.* at 272. "Of course, the trial courts, in determining the general acceptance issue, must consider the quality, as well as quantity, of the evidence supporting or opposing a new scientific technique." *Id.* (quoting *People v. Leahy*, 8 Cal. 4th 587, 34 Cal. Rptr. 2d 663, 882 P.2d 321, 336–37 (1994)).

"Evidence based on a novel scientific theory is inherently unreliable and inadmissible in a legal proceeding in Florida unless the theory has been adequately tested and accepted by the relevant scientific community." *Ramirez v. State*, 810 So. 2d 836, 843 (Fla. 2001). As our supreme court has explained: "[T]he underlying theory for this rule is that a courtroom is not a laboratory, and as such it is not the place to conduct scientific experiments. If the scientific community considers a procedure or process unreliable for its own purposes, then the procedure must be considered less reliable for courtroom use." *Stokes v. State*, 548 So. 2d 188, 193–94 (Fla. 1989).

We have explained that the introduction of expert testimony concerning a new or novel scientific principle or process is a four-step procedure:

> 1) the trial judge must determine whether such expert testimony will assist the jury in understanding the evidence or in determining a fact in issue; 2) the trial judge must decide whether the expert's testimony is based on a scientific principle or discovery that is sufficiently established to have gained general acceptance in the particular field in which it belongs; 3) the trial judge must determine whether a particular witness is qualified as an expert to present opinion testimony on the subject in issue; 4) the judge may then allow the expert to render an opinion on the subject of his or her expertise, and it is then up to the jury to determine the credibility of the expert's opinion, which it may either accept or reject.

*Matos v. State*, 899 So. 2d 403, 406–07 (Fla. 4th DCA 2005) (internal quotation marks omitted).

When applying the *Frye* test, "the court may peruse disparate sources— e.g., expert testimony, scientific and legal publications, and judicial opinions—and decide for itself whether the theory in issue has been sufficiently tested and accepted by the relevant scientific community." *Ramirez*, 810 So. 2d at 844 (footnotes and internal quotation marks omitted). However, "[a] bald assertion by the expert that his deduction is premised upon well-recognized scientific principles is inadequate to establish its admissibility if the witness's application of these principles is untested and lacks indicia of acceptability." *Id.*

"The proponent of the evidence bears the burden of establishing by a preponderance of the evidence the general acceptance of the underlying scientific principles and methodology." *Castillo v. E.I. DuPont de Nemours*

*& Co., Inc.*, 854 So. 2d 1264, 1268 (Fla. 2003). Moreover, "[i]n utilizing the *Frye* test, the burden is on the proponent of the evidence to prove the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand." *Ramirez v. State*, 651 So. 2d 1164, 1168 (Fla. 1995).

Here, as explained above, the trial court did not apply *Frye* to Dooley's braking opinion because at the time of trial, the *Daubert* Amendment— which had not yet been ruled unconstitutional—controlled the admissibility of expert opinions.

Notably, although we recognize that the field of accident reconstruction is not a new or novel science, the acceptance of accident reconstruction generally does not mean that every method purported to reconstruct some aspect of driving is based upon generally accepted underlying scientific principles and methodology. For example, in *Brim*, the fact that one part of DNA testing met the requirements of *Frye* did not exempt another part of the testing from independent satisfaction of the *Frye* requirements.

Accordingly, because Dooley's expert testimony played a key role in the trial below, we reverse and remand this case with directions for the trial court to conduct a *Frye* hearing to determine the admissibility of this testimony. *See Brim*, 695 So. 2d at 275 (remanding for a limited evidentiary hearing and *Frye* determination).

The trial court shall first determine whether the expert's method for determining braking is new or novel. If the trial court finds that the opinion is based on a new or novel scientific method, the trial court shall utilize the *Frye* test in determining the admissibility of the expert opinion based on the general acceptance within the relevant scientific community of the underlying scientific principle and method.

However, if the trial court finds that the opinion is not based on a new or novel scientific method, the trial court shall determine whether the expert's opinion was admissible as "pure opinion." Where expert testimony is not based on a new or novel scientific methodology, the expert may offer "pure opinion" testimony based solely on the expert's training and experience. *Marsh v. Valyou*, 977 So. 2d 543, 545–49 (Fla. 2007). In *Marsh*, the court emphasized that the experts' underlying methodology was not subject to challenge, as the court had previously held that the methodology at issue (i.e., differential diagnosis) was generally accepted. *Id.* at 549. The court further explained: "A challenge to the conclusions of Marsh's experts as to causation, *rather than the methods used to reach*

*those conclusions*, is a proper issue for the trier of fact." *Id.* (emphasis added).

We do not read *Marsh* as holding that an expert's invocation of the magic words "training and experience" automatically allows the expert to give testimony as "pure opinion." There must be a connection between the expert's methodology and the expert's training and experience.

We further conclude that a trial court must have some role in ensuring the reliability of expert testimony, even if the testimony is not based on new or novel scientific methods. Our conclusion is consistent with the Florida Supreme Court's longstanding adherence "to the principle that it is the function of the court to not permit cases to be resolved on the basis of evidence for which a predicate of reliability has not been established." *DeLisle*, 258 So. 3d at 1226 (quoting *Hadden v. State*, 690 So. 2d 573, 578 (Fla. 1997)).

Therefore, to be admissible as "pure opinion" testimony, the proponent of an expert opinion must make a showing that the methods the expert used to reach his conclusions were within the scope of his training and experience. This was the case in *Marsh*, where the method of differential diagnosis was within the scope of the medical doctors' training and experience.

On remand, if the trial court finds that the expert's braking opinion is not subject to *Frye*, the trial court shall determine whether the expert had training and experience in the specific method he used to reach his conclusions. Specifically, the trial court shall determine whether the expert's methodology—i.e., visually inspecting the shape of the crush damage on one vehicle to determine whether the vehicle that caused the crush damage was braking—was within the scope of the expert's training and experience.

If the trial court finds that the State has failed to meet its burden of proof for the admissibility of the braking opinion, the court shall grant a new trial. If the trial court finds to the contrary, the trial court shall reinstate appellant's convictions and sentences.

*Reversed and Remanded.*

MAY and CIKLIN, JJ., concur.

\*          \*          \*

11