**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2899-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MICHAEL N. PILLARELLA,

    Defendant-Appellant.

_____

Submitted September 23, 2025 – Decided October 10, 2025

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 21-06-0811.

Kelly Anderson Smith, LLC, attorney for appellant (Kelly Anderson Smith, of counsel and on the briefs).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel Marzarella, Chief Appellate Attorney, of counsel; Shiraz Deen, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Michael N. Pillarella appeals from a May 10, 2023 judgment of conviction entered after he was found guilty by a jury of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), and third-degree assault by automobile, N.J.S.A. 2C:12-1(c)(2). We affirm.

I.

We summarize the facts and trial testimony relevant to the issues raised on appeal. The State alleges that on January 30, 2021, defendant was operating a motor vehicle under the influence of multiple controlled dangerous substances (CDS) and alcohol in Little Egg Harbor when he crossed the center line of the roadway and collided with a motor vehicle operated by K.E., who was seventeen years old, and occupied by G.P., who was sixteen years old.[1] The accident resulted in the death of G.P. and serious bodily injury to K.E.

An Ocean County grand jury returned an indictment charging defendant with first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1); second-degree vehicular homicide, N.J.S.A. 2C:11-5(a); third-degree strict liability vehicular homicide, N.J.S.A. 2C:11-5.3; second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); and third-degree assault by automobile.

---

[1]  We utilize initials to protect the identities of the minor victims and their medical records, reports, and evaluations.  R. 1:38-3(a)(1) and (2)

The State called the following witnesses at trial: K.E.; Lauren Meglino-Runzo and Christina O'Brien, Little Egg Harbor volunteer emergency medical technicians who responded to the accident; Police Officer Robert Peschko of the Little Egg Harbor police department who responded to the accident; Kathleen McNulty, a trauma nurse at AtlantiCare Regional Medical Center (ARMC) where defendant was airlifted after the accident; Robert Parlow, an expert in "crash reconstruction"; Celeste Esposito, manager of Mystic Island Pizza where defendant worked on January 30, 2021; Kevin Kane, manager of Mystic Islands Casino where defendant was drinking prior to the accident; Dr. Richard Cohn, an expert in pharmacology and forensic toxicology; Dr. Robert J. Pandina, an expert in psychopharmacology, neuropsychology, and the effects of drugs and alcohol on human physiology and behavior; and Detective Raymond Coles of the Ocean County Prosecutor's Office (OCPO), an expert in computer forensics. Defendant did not testify.

K.E. testified that on the evening of January 30, 2021, she drove to pick up her friend, G.P., from her home in Little Egg Harbor and they spent time together having dinner, getting ice cream, and taking photographs. At approximately 9:30 p.m., K.E. was driving G.P. home southbound on Radio Road in Little Egg Harbor when she saw "bright headlights right in front of [her]

3

in [her] lane." The other vehicle was driving "very fast," and "the lights came out of nowhere." K.E. said "oh my God" because "she looked up and the headlights were just right there." K.E. turned her steering wheel to the left to avoid colliding with the other vehicle. The accident happened about "[t]hree seconds" after K.E. first saw the headlights coming at her.

K.E. was unconscious after the accident and recalled "[w]aking up and . . . seeing lights around and smoke." She did not see G.P. K.E. was airlifted to Jersey Shore Medical Center (JSMC) where she was hospitalized for two weeks and underwent multiple surgeries.

Meglino-Runzo responded to the scene of the accident and assisted with defendant's treatment. She "was pretty sure that [she] smelled alcohol" when defendant was in the car. She asked him if he had taken any drugs and he responded, "he was on methadone." "[H]e was asked if he had anything to drink . . . and he . . . said that he had drank hard alcohol." Defendant "asked what had happened . . . and how fast he was going." Defendant's "eyes were a little glassy" and his speech was slurred.

O'Brien also responded to the scene and attended to defendant. She testified that when she was next to defendant in the ambulance "[t]here was a

A-2899-22

heavy odor of alcohol." Defendant "said he was on methadone," and said he had consumed "half a bottle of hard alcohol."

Officer Peschko responded to the scene of the accident. He observed K.E. in the driver's seat of her vehicle and G.P. in the passenger seat. "[I]t was difficult to see [G.P.] due to the amount of damage inside the vehicle. But she was compressed between the . . . front passenger seat and the dashboard." "[T]he fire department had to cut the roof off of the vehicle and remove her."

Officer Peschko left the scene and went to ARMC "to go get a blood draw from [defendant] and his cell phone." Defendant was in the waiting room when the officer arrived. A nurse performed the blood draw at 2:07 a.m. Defendant voluntarily surrendered his cell phone to Officer Peschko.

On cross-examination, defense counsel asked if he observed whether G.P. was wearing a seatbelt. Officer Peschko responded he "was unable to see." Defense counsel also asked if he had "cause to be concerned that [defendant] was intoxicated as [he was] speaking with him" at the hospital. Officer Peschko responded "[y]es" because defendant's "speech was slurred, it was slowed[,] and his eyelids were drooping."

McNulty evaluated defendant when he arrived at ARMC at approximately 10:47 p.m. As a part of her initial assessment, she asked defendant if he was

5

taking any prescribed medications and defendant "reported he was taking methadone." McNulty drew a sample of defendant's blood for diagnostic purposes at 11:00 p.m.

G.P. was transported to JSMC. Tragically, G.P. died on February 9, 2021, as a result of injuries she sustained in the accident.

Parlow was qualified as an expert in "crash reconstruction" without objection. He testified an event data recorder (EDR) is "a module" that is "mounted in between the seats" that stores data "when the airbag goes off." Parlow downloaded the information contained on the EDR from defendant's vehicle and generated a report.

The EDR in defendant's vehicle included pre-crash data. Five seconds before impact, defendant was traveling 74.5 miles per hour. The speed limit in the area is forty-five miles per hour. Defendant accelerated to 80.7 miles per hour one and one-half seconds before impact. He was traveling 78.9 miles per hour one second before impact, 77.0 miles per hour one-half second before impact, and 74.5 miles per hour at impact. Defendant had the acceleration pedal depressed to eighty-five percent until approximately one second before impact.

The EDR also contained steering input readings that showed defendant made a forty-five degree right turn across the road to the point where the

accident occurred one second before impact. The service brake data from the EDR showed defendant's "foot was not on the brake at all" prior to impact.

Parlow opined, based on his analysis of evidence at the scene of the accident, defendant's vehicle was driving northbound while fully centered in the southbound lane before the start of the hard wheel turn to the right that "put him . . . where the impact was." Based on his investigation, Parlow concluded:

> [Defendant's vehicle] was traveling northbound on Radio Road in the northbound lane. For some reason, he traveled into the southbound lane and he got to a point where he turned the wheel and traveled towards the double yellow line. [K.E.'s vehicle] was traveling southbound and she went to the left to try to get away from him and the impact took place between . . . both vehicles. . . . [T]here[ was] no way [K.E.] could get out of the way and . . . she traveled into the [northbound] lane and got hit head on.

According to Parlow, defendant caused the accident when his vehicle "traveled into the opposite lane of travel, continued northbound in the southbound lane[,] and then traveled into the area where the impact took place."

Esposito testified defendant was employed as a pizza maker at Mystic Island Pizza and worked on January 30, 2021. "[T]hroughout the afternoon" she noticed defendant was taking frequent trips to the bathroom, he "exit[ed] the building" twice, and at approximately 7:00 or 7:30 p.m., "he was sitting at a table, eating a slice of pizza . . . nodding out."

7

Based on these observations, Esposito decided to terminate his employment and "had . . . a friend escort him out and let him know that he was done." Approximately ten to fifteen minutes later, defendant sent Esposito text messages "trying to explain the situation" and "sending [her] pictures of medication bottles." Defendant's text messages, obtained from Esposito's phone, were entered in evidence and published to the jury.

Kane testified defendant entered the Mystic Islands Casino bar at approximately 9:00 p.m. Defendant was captured on the casino's interior and exterior surveillance video system. Kane briefly spoke with defendant shortly after he arrived. Defendant had just been served an alcoholic beverage. Sometime later, one of Kane's employees "alert[ed] [him] that [defendant] was exhibiting some concerning behavior[,] and they wanted to stop serving him alcohol or take his drinks away." Kane "removed his drinks" and "had a small altercation with him bothering another table and [he] asked [defendant] to come outside and talk." Kane "ushered him out" and spoke to him outside for "[ten], [fifteen] minutes or so."

Kane "was trying to get him a ride home safe because he was . . . exhibiting some concerning behaviors . . . and [he] just wanted to make sure he got home safe." Kane "offered him a cab, . . . offered him a ride in [his]

A-2899-22

truck, and [he] as well as a couple of patrons and one of [his] employees . . . [were] trying to get [defendant] home safe and get him to take a ride." Defendant was "slurring and swaying around" but he "got in his car . . . and he left." The interior and exterior surveillance video, including Kane's interaction with defendant inside the casino and in parking lot, was played for the jury.

Dr. Cohn was qualified as an expert in pharmacology and forensic toxicology without objection. He testified the testing of defendant's first blood sample, which was collected at approximately 10:58 p.m., generated the following findings: .053 blood alcohol concentration (BAC); eighty nanograms of alprazolam, the generic name for Xanax, per milliliter; 0.3 nanograms of fentanyl per milliliter; and 390 nanograms of methadone per milliliter. Testing of defendant's second blood sample, which was collected at approximately 2:07 a.m., revealed: BAC of zero; ninety-five nanograms of alprazolam per milliliter; 249 nanograms of methadone per milliliter; and .6 nanograms of fentanyl per milliliter. Testing of K.E.'s blood sample did not reveal evidence of any significant toxicological substances.

Dr. Pandina was qualified as an expert in psychopharmacology, neuropsychology, and the effects of drugs and alcohol on human physiology and

9

behavior without objection. Dr. Pandina testified that based on his analysis of defendant's documented behavior and actions on the night of the accident, as well as the results of his blood analysis, specifically the change in concentration of alcohol and CDS in his blood between the two tested blood samples drawn approximately three hours apart, defendant's CDS and alcohol levels at the time of the accident were likely to have been: 0.05 BAC; methadone level between 380 and 400 nanograms per milliliter of blood; alprazolam level of at least 70 nanograms per milliliter of blood; and fentanyl level of 0.3 nanograms per milliliter of blood.

According to Dr. Pandina, "methadone is a synthetic opiate, generally considered a narcotic analgesic." Methadone and alcohol "both have sedative actions" and the combination of the two substances enhances the effect of both. Combining methadone and alcohol produces "an additive effect and . . . a synergistic effect. In other words, the methadone affects the alcohol, [and] the alcohol affects the methadone."

Dr. Pandina explained the combination of methadone and alprazolam also has "both additive effects and synergistic effects" and "when you combine methadone levels with alprazolam levels, the amount of methadone that[ is] necessary to create greater impairment [is lower] and the amount of alprazolam

10

that[ is] in combination is also lower." Dr. Pandina opined that the four substances detected in defendant's blood collectively resulted in "a very high level of impairment" at the time of the accident.

Detective Coles was qualified as an expert in computer forensics without objection. On February 16, 2023, he testified regarding his work copying the surveillance video from Mystic Islands Casino and extracting information from K.E.'s cell phone and processing the data using "Cellebrite software." The next day, our Supreme Court issued its opinion in State v. Olenowski (Olenowski I), 253 N.J. 133 (2023), adopting the Daubert[2] standard for scientific reliability of expert testimony in criminal cases in place of the previously recognized Frye[3] standard.

Based on Olenowski I, defendant moved to preclude testimony regarding the forensic extraction of text messages from his cell phone because the Cellebrite software used by Detective Coles had not been subject to scrutiny applying the Daubert standard. In response, on February 21, the court conducted a N.J.R.E. 104 hearing at which Detective Coles testified. On February 22, the court denied the motion in an oral opinion.

---

[2] Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579 (1993)

[3] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)

On February 23, Detective Coles was recalled as an expert in computer forensics regarding his extraction of text messages from defendant's cell phone using the Cellebrite software. He located text messages that had been deleted several hours after the accident.

On January 30, 2021, at 2:23 p.m., defendant texted someone listed in his phone contacts as "Kay" and asked, "How can I get my bars?" Defendant wrote she should drive to Mystic Island Pizza in Little Egg Harbor, that he had "140 in [his] cup holder," and she should let him know when she arrived "to unlock." Defendant asked if she could arrive before 5:00 p.m., because he intended to "make over [two-hundred] pizzas" that night.

At 5:21 p.m., defendant texted Kay, asking if "it" was there and if she locked the car door. Kay responded, "[a]rmrest." At 5:38 p.m., defendant asked Kay, "[h]ow many Zans were in there, [ten] or [thirteen]?" Kay responded, "12*." Defendant replied, "I did[ not] look, I just took two, lol."

On March 3, 2023, the jury found defendant not guilty of aggravated manslaughter, but guilty of the lesser-included offense of reckless manslaughter. It also found defendant not guilty of aggravated assault, but guilty of the lesser-included offense of assault by auto. On May 10, 2023, he was sentenced to an extended term of seventeen years in prison pursuant to N.J.S.A. 2C:44-3(a),

subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, for reckless manslaughter, and a consecutive sentence of four years in prison for assault by auto.

II.

On appeal, defendant raises the following points for our consideration.

POINT I

THE STATE IRREPARABLY PREJUDICED JURORS AGAINST THE DEFENDANT BY ITS INFLAMMATORY COMMENTARY AND IMPROPER INFERENCES.

POINT II

THE TRIAL COURT FAILED TO SUPPRESS IMPROPER HIGHLY PREJUDICIAL 404(B) EVIDENCE.

POINT III

DEFENDANT'S TRIAL WAS IRREPARABLY PREJUDICED WHEN THE COURT FAILED TO EXCLUDE DEFENDANT'S TEXT MESSAGES VIA CELLEBRITE EXTRACTION.

POINT IV

THE TRIAL COURT'S INSUFFICIENT AND IMPROPER INSTRUCTIONS AND JURY CHARGES DENIED DEFENDANT A FAIR IMPARTIAL TRIAL.

## III.

We are not persuaded by defendant's claims of prosecutorial misconduct during the State's summation.  A trial court "has broad discretion in the conduct of the trial, including the scope of counsel's summation."  Litton Indus. v. IMO Indus. Inc., 200 N.J. 372, 392 (2009).  Accordingly, we review the court's ruling regarding the parties' summations for an abuse of discretion.  Id. at 392-93.

Generally, "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented."  State v. Williams, 471 N.J. Super. 34, 43 (App. Div. 2022) (quoting State v. Frost, 158 N.J. 76, 82 (1999)).  "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times [their] 'remarks and actions [are] consistent with [their] duty to ensure that justice is achieved.'"  State v. Jackson, 211 N.J. 394, 408 (2012) (first and third alterations in original) (quoting State v. Williams, 113 N.J. 393, 447-48 (1988)).

"A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted."  State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000) (quoting State v. C.H., 264 N.J. Super.

112, 135 (App. Div. 1993)); see also State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991) (explaining a prosecutor may respond in summation to defense counsel's insinuation the State's witnesses had lied and framed the defendant). Prosecutors may "strike hard blows . . . [but not] foul ones." State v. Wakefield, 190 N.J. 397, 436 (2007) (quotation omitted). "Generally, remarks by a prosecutor, made in response to remarks by opposing counsel, are harmless." C.H., 264 N.J. Super. at 135.

Defendant contends the State "was sarcastic, denigrating, unprofessional, and disparaging to the [d]efense." For example, he contends the State improperly implied "defendant was more concerned with himself and not the victims" when the prosecutor said, "oh woe is me" in reference to defendant's conduct after the accident. He argues the prosecutor "taunted the [d]efense" with "sarcasm" by saying he "did[ not] hear anybody saying they went out [and] saw an [eighty] mile-an-hour speed limit sign out there. No, no. In the places where it mattered, the entire stretch, [forty-five]. He knew it."

He argues it was improper for the prosecutor to ask, "[h]ow could he possibly think something could go wrong? So when you[ are] going [eighty] miles an hour and the phantom deer jumps out in front of you, you do[ not] use the brake, nah, you just swerve into the lane of oncoming traffic, just for a

15

second." And he argues the State incorrectly implied defendant was "blaming the victim" by commenting it was "not a defense" to argue K.E. "should have reacted better, she should have maneuvered better, she should have been a more experienced driver."

Defendant also asserts it was improper for the State to note that defense counsel:

> talked to [the jury] about each of the four substances. There is no, just so we[ are] clear, there is no parsing out these substances. Oh, alcohol is safe. Oh, methadone, I have a prescription. Oh, Xanax, you could get a prescription, I did[ not] have one, oh, fentanyl, I do[ not] know.

Defense counsel objected "because the way the questions [were] being phrased seems to be literally just ridiculing the defense attorney's closing[], if nothing else." The court noted "the vast majority of what [the State] ha[d] said [were] legitimate, fair comments" but it did not "want it to be disparaging to defense counsel." Immediately thereafter, the court read the following curative instruction to the jury:

> Ladies and gentlemen, we[ are] going to continue in a moment with [the State's] summation. I[ would] like to instruct you that what both attorneys say in the summation is not evidence. The evidence, as you know, and [the court has] told you multiple times and [the court will] tell you again, comes from the testimony of witnesses and any exhibits [the court]

16

admit[s] into evidence. But both sides are entitled to be forceful advocates for each other. To the extent anything [the State] said could be construed as criticizing [defense counsel's] obligations to represent [defendant], that would be inappropriate. If you took it that way, you should not, you should disregard that and not consider that. You should consider the comments made in summations as the attorneys' argument about what the evidence shows or the evidence does[ not] show and you should take it that way.

We are persuaded the State's summation, while it struck hard blows, was reasonably related to the evidence and was responsive to arguments advanced in defense counsel's summation. For example, defense counsel argued defendant "consume[d] safe drinks but [had] an unexpected reaction" and "is not a Ph.D. in pharma[]psychology to know exactly how these substances work, how substances interact, what could be mixed." "He does[ not] necessarily know that methadone and alcohol has . . . an exponential effect . . . [and] that each one stimulates the other's absorption and effects." "All he knew what he was consuming was a legal limit and he felt okay to drive." Counsel argued "the alcohol amount consumed was a safe amount . . . but there was . . . an unexpected reaction[,] . . . a sudden reaction to a mixture, safe alcohol mixed with prescribed methadone and taken as prescribed."

With respect to the area of the accident, counsel argued "there[ are] trees, there[ are] deer crossings." Defendant was "driving in his own lane and he

17

cross[ed] over, one second, immediately switche[d] back."

Unfortunately for everyone involved, no one had time to brake. Also unfortunately for everybody involved, the driver, [K.E.], responded by swerving into the opposite lane, exactly as he was correcting back to his lane, realizing his mistake. There[ is] no time to brake for anyone, according to the expert. But all there is time to do, which is what [defendant] does, is release the gas pedal to slow down.

. . .

But we do[ not] know what happened there, we do[ not] know if he saw a deer, saw debris, saw a car that was turning . . . and tried to avert it . . . or got distracted by something, we do[ not] know. What we do know is that it was for a second, oh, my God, and swerves back.

. . .

We know that [K.E.] is driving [her vehicle] . . . southbound on Radio Road. We do[ not] know her speed, any details of her driving at all. . . . What we do know is that she swerves into the opposite lane and it[ was] a head-on collision into [defendant]'s car in his own lane. She has a probationary license for less than a year, has Bluetooth on, which is listening to music, and she receives a text from [G.P.] at the same moment for a split second before the accident takes place.

[W]e[ are] not placing blame on [K.E.], but we[ are] . . . focusing on [defendant's] awareness . . . that there will be a newer driver driving down and would swerve to an incoming lane.

18

Counsel attempted to explain defendant's decision to delete the text messages Detective Coles recovered. He argued:

> It[ is] important to put yourself in [defendant]'s shoes to figure out if his conduct was so reckless, so beyond what a reasonable person would do. He[ is] [twenty-six] years old, he just got into a car accident. Somebody is clearly hurt. You[ are] upset and crying for hours about the fact that this happened to you, the fact that you hurt somebody. And you realize there[ are] text messages that may get you into more trouble about maybe buying some kind of Xanax that maybe should have been prescribed. It[ is] natural to be scared, it[ is] natural to freak out and take measures to try to . . . make the situation that[ is] already bad less worse.

The remarks defendant alleges constituted prosecutorial misconduct were responsive to arguments raised specifically or by implication in defendant's summation. The State responded to defendant's attempts to characterize his drinking as safe, his use of CDS as prescribed in part, and the reaction of all four substances in his system as unexpected. It also responded to the implication that defendant may have swerved to avoid a deer, and the accident could have been avoided if K.E. was an experienced driver who might not have left her lane when she saw defendant coming directly at her.

Moreover, the court gave a timely, forceful curative instruction in response to defendant's objection. When appropriate, a trial court can give the

19

jury a curative instruction to remedy any prejudicial effect caused by a prosecutor's allegedly improper remark.  Hawk, 327 N.J. at 283.

"The type of necessary curative instruction is in the discretion of the trial court judge who is in the best position to decide what is needed."  Ibid. (citing State v. Winter, 96 N.J. 640, 647 (1984)).  "An effective curative instruction needs to be 'firm, clear, and accomplished without delay.'"  State v. Prall, 231 N.J. 567, 586 (2018) (quoting State v. Vallejo, 198 N.J. 122, 134 (2009)).  The jury is presumed to have understood and followed such instructions when given. State v. Feaster, 156 N.J. 1, 65 (1998); State v. T.J.M., 220 N.J. 220, 237 (2015) (appellate courts "act on the belief and expectation that jurors will follow the instructions given them by the court.").

The court's curative instruction in this case was timely and appropriate. To the extent the State made any comments that exceeded the bounds of proper summation, the court's instruction ameliorated any possible harm.

Defendant also argues the prosecutor mischaracterized the evidence and applicable law by arguing it was "a gosh darn certainty" an accident would happen based on defendant's operation of the vehicle.  The prosecutor argued further:

> You[ are] going to hear from the judge.  He[ is] going
> to charge you on the law.  You[ are] going to get the

verdict sheet. We went over the lesser-included charges, clearly he[ is] guilty of those. I[ am] here talking to you about aggravated manslaughter and aggravated assault and the fact that based upon the evidence, the evidence demands you return a verdict of guilty on those two charges and those will be the first charges you address for each victim. Once you return a verdict of guilty as to those two charges, your service is complete.

In response to defendant's objection, the court immediately read the following curative instruction to the jury:

Ladies and gentlemen, there was an objection . . . by the defense to the comment that the evidence demands a certain result.

Attorneys are allowed to be forceful advocates for their respective positions and they[ are] expected to be. I[ am] going to give you detailed instructions as to how to decide the case. The evidence does[ not] demand the result one way or the other, what[ is] requested of you is that you be a fair and impartial jury and consider all the evidence and you arrive at a just verdict. So it[ is] going to be your job, as I told you before and I[ am] going to tell you again, you[ are] the judges of the facts. So that argument is exactly that, it[ is] an argument or comment. I ask you just to disregard the word demands in there. Take again the prosecutor's comments as being a forceful advocate, just like [defense counsel's] comments were being a forceful advocate.

The court's instruction was timely and appropriate. To the extent the State mischaracterized the evidence or the law, the court's instruction cured the error. There is no reason for us to disturb the court's decisions on defendant's

21

objections to the State's summation or the curative instructions given by the court.

## IV.

Defendant's contention the court failed to suppress "improper highly prejudicial evidence" under N.J.R.E. 404(b), lacks merit. We review a trial court's evidentiary rulings for an abuse of discretion. State v. Kemp, 195 N.J. 136, 149 (2008). "[S]ensitive admissibility rulings regarding other-crimes evidence made pursuant to [N.J.R.E.] 404(b) are reversed '[o]nly where there is a clear error of judgment.'" State v. Green, 236 N.J. 71, 81 (2018) (third alteration in original) (quoting State v. Rose, 206 N.J. 141, 157-58 (2011)).

N.J.R.E. 404(b) provides, in pertinent part:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.
>
> This evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

To be admissible:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[State v. Cofield, 127 N.J. 328, 338 (1992) (footnote omitted) (citing Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160 (1989)).]

However, certain evidence of other wrongful conduct does not require analysis under N.J.R.E. 404(b). As set forth in Rose, evidence which is intertwined with the other crime charged, provides a background to the events, or "completes the story," is intrinsic evidence. 206 N.J. at 180-181. Evidence that is "intrinsic" is admissible if relevant, and not excludable under N.J.R.E. 403. Id. at 177-78. Intrinsic evidence is admitted "as 'necessary parts of the proof of an entire deed,' or as 'inseparable elements of the deed,' or as 'concomitant parts of the criminal act.'" Id. at 177 (quoting 1A Wigmore on Evidence § 218, at 1888 (Tillers rev. 1983)).

Defendant contends Meglino-Runzo should not have been permitted to testify defendant said he "was on methadone" and "had drank hard alcohol." O'Brien should not have been allowed to testify he said he "was on methadone"

and consumed "half a bottle of hard alcohol." McNulty should not have been permitted to testify defendant "reported he was taking methadone." He similarly argues Esposito should not have been permitted to testify defendant sent her "pictures of medication bottles" to explain "the situation and why he was terminated." We are not convinced.

The court correctly determined evidence of defendant's use of methadone and alcohol was intrinsic to the State's case. Defendant's level of intoxication from a combination of substances including methadone and alcohol was central to the case. Even so, the court instructed the jury using Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. Sept. 19, 2016), that it was only to consider this evidence to determine whether defendant was impaired and acting recklessly, and not for any other purposes.

We are also satisfied that if it was error to admit this testimony, the error was harmless. We apply the harmless error rule when, as here, a specified error was brought to the trial judge's attention. State v. G.E.P., 243 N.J. 362, 389 (2020). We must determine whether there was "'some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached.'" State v. Lazo, 209 N.J. 9, 26 (2012) (first

alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).  In doing

so, we must independently assess the quality of the evidence of defendant's guilt.

State v. Sterling, 215 N.J. 65, 102 (2013).

That is so because:

> [t]rials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. "A defendant is entitled to a fair trial but not a perfect one."
>
> [R.B., 183 N.J. at 333-34 (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).]

Here, as defendant concedes, his use of methadone and alcohol was

introduced without objection through the testimony of Doctors Cohn and

Pandina.  Testimony from the other witnesses confirming defendant was on

methadone or consumed alcohol did not lead the jury to a verdict they otherwise

might not have reached.

Defendant's arguments regarding Kane's testimony are meritless.  Kane

did not testify about defendant's "recent resurgence of a [h]eroin

addiction . . . loss of employment, as well as his love for Xanax."  Those topics

were only addressed at a N.J.R.E. 104 hearing outside the presence of the jury

and were expressly excluded by the court.  As a result, Kane only testified about

his interactions with and observations of defendant at the casino and in the parking lot. Defendant fails to articulate any valid basis for his arguments regarding Kane's testimony on appeal.

V.

Defendant contends the court improperly permitted the State to introduce text messages Detective Coles extracted from his cell phone. We are not persuaded.

In Olenowski I our Supreme Court outlined four "non-exclusive" factors identified in Daubert to assist the trial court in evaluating the admissibility of expert evidence under N.J.R.E. 702: "(1) whether the scientific theory or technique can be, or has been, tested; (2) whether it 'has been subjected to peer review and publication'; (3) 'the known or potential rate of error' as well as the existence of standards governing the operation of the particular scientific technique; and (4) general acceptance in the relevant scientific community." Id. at 147 (quoting Daubert, 509 U.S. at 593-94). "The Court emphasized the inquiry is 'a flexible one' and that its 'focus . . . must be solely on principles and methodology, not on the conclusions that they generate.'" Ibid. (quoting Daubert, 509 U.S. at 594-95).

26

The Court made clear in Olenowski I, however, "[n]othing in [its] decision disturbs prior rulings that were based on the Frye standard. Future challenges in criminal cases that address the admissibility of new types of evidence should be assessed under the new standard." 253 N.J. at 468. "The same is true for challenges to admissibility of evidence that has previously been sanctioned but the scientific reliability underlying the evidence has changed." Id. at 468-69.

In State v. Olenowski (Olenowski II), 255 N.J. 529, 580-81 (2023), our Supreme Court adopted a hybrid appellate review standard to assess "the bona fides of an expert's methodology" and its application to the case:

> Going forward, we hold that in New Jersey criminal and quasi-criminal cases in which the trial court has admitted or excluded an expert witness based upon Daubert reliability factors, our appellate courts shall review that reliability determination de novo. However, other case-specific determinations about the expert evidence—such as whether the witness has sufficient expertise, whether the evidence can assist the trier of fact in that case, and whether the relevant theory or technique can properly be applied to the facts in issue—should be reviewed for an abuse of discretion.

N.J.R.E. 702 governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

27

To satisfy the Rule, the proponent of the evidence must demonstrate:

> (1) the subject matter of the testimony must be beyond the ken of the average juror; (2) the field of inquiry must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the testimony.
>
> [Olenowski I, 253 N.J. at 143 (internal quotation marks omitted) (quoting State v. J.L.G., 234 N.J. 265, 280 (2018)).]

At the N.J.R.E. 104 hearing, Detective Coles testified he was assigned to the OCPO's High Tech Crime Unit in "the forensics laboratory, the process of extracting phones and interpreting the contents of the extractions." His training included "the Cellebrite Certified Operator and Cellebrite Certified Physical Analyst" classes, and he obtained Cellebrite's "Capstone certification which is the Cellebrite Certified Mobile Examiner." In the two years prior to the hearing, he performed at least one thousand cell phone extractions and "almost every single phone [was] processed with Cellebrite."

The Cellebrite program makes "a duplicate of the contents of that phone, it[ is] placing it into a special container archive file where it then fingerprints that file . . . using a . . . hashing algorithm to state that [the] file is the contents of the phone and date and time the extraction was conducted." The "second component involves the . . . processing of the extractions created." "It . . . uses

28

different plug-ins and scripts to analyze the data to show the investigator analyst what the contents of the phone extraction is in an easily digestible format." The investigator would see "call logs, text messages, web history, images, videos, location data, account data, user passwords[,] and some other emails."

In this case, defendant's cell phone was previously extracted by Cellebrite Advanced Services (CAS). Due to trial logistics, Cellebrite was not able to send a representative to testify and, with defendant's consent, Detective Coles conducted his own extraction. He "initiated the full file system extraction which was the same type of extraction . . . conducted by [CAS]." He then compared his extraction to the CAS extraction to confirm they were consistent.

Detective Coles testified Cellebrite software is used for cell phone extractions by "several thousand agencies around the world." Cellebrite has been commercially available since 2007. The OCPO was using the Cellebrite software before he arrived in 2017. "[T]he software itself is NIST [National Institute of Standards and Technology] certified." That is "a [f]ederal institute that tests and calibrates testing equipment." The "Cellebrite software is generally considered reliable and accurate. It does what it says."

Detective Coles "periodically validate[s] any results" by comparing the results to "the time stamp on th[e extracted] phone and verifying the content is

A-2899-22

exactly the same as being presented within the physical analyzer software." He also completed "external efficiency examinations through . . . Collaborative Testing Services" and was "deemed proficient" utilizing Cellebrite software.

The "only issues [he] ever encountered" related to the possible incorrect interpretation of the time stamp. However, "it[ is] easy enough to validate the time by going to the actual database and finding out the correct way it[ is] supposed to be formatted." Even if that happens, "it[ is] not changing user content." It "never changes the actual[]verbiage from the text messages, it just might be the time stamps that were being utilized."

On February 22, 2023, the court denied defendant's motion to suppress the extracted text messages in a comprehensive and well-reasoned oral opinion. The court "generally agree[d]" "testimony regarding a download or transfer of files and data from one electronic device to another is not expert testimony and need not be presented by an expert and that jurors can understand that." However, because Detective Coles was presented as an expert witness earlier in the trial before Olenowski I was decided, he also determined his testimony was admissible applying the Daubert factors.

The court found Detective Coles "qualified as an expert witness . . . because he has the skill, experience[,] and training to conduct a

forensic download." It noted "the State has not asked the detective to render an opinion or interpretation on the evidence." The court determined "it[ is] appropriate for him to testify as an expert even though it[ is] probably true that part of what he[ is] saying is lay witness testimony." Detective Coles was "not conducting science experiments, he[ was] not analyzing blood, DNA, [or] bullet fragments. He[ was] transferring dat[a] from one electronic device to another."

The court found Detective Coles credible. Applying <u>Daubert</u> factor one, it determined "the technique utilized . . . has been tried and tested nationwide, if not worldwide, used by thousands of law enforcement agencies and it[ is] the type of technique that if it was inaccurate, certainly would have come to the attention of courts." "In addition, this is not a scientific technique which involves the interpretation of evidence." "[S]ending something electronically" involves "technology [that] is not novel, it[ is] something common and the jury can understand how the software utilized by the detective take[s] . . . electronic . . . information and then produces it onto paper."

Applying the second factor, the court referred to <u>State v. Pratt</u>, 200 Vt. 64 (Vt. Sup. Ct. 2015), which described how Cellebrite

> results are tested in court through defense experts and through a peer review process of the type of national conferences and organizations that the forensic examiners belong to, that they compare results with

31

each other, that there[ are] manual examination[s] of devices, and that the program's reliability is established in the forensic industry.

The court concluded, Detective Coles "testified exactly to that.  So . . . to the extent that type of peer review is applicable, factor number [two] has been satisfied."

As to factor three, the court determined "there[ is] nothing to indicate that messages which are downloaded from the electronic device are somehow false, that they[ have] been downloaded in a way to alter their content.  So we[ are] not dealing with an error rate based on opinion testimony which is subject to some interpretation."  "[E]ither the download is successful or it[ is] not."

The court concluded factor four was satisfied because "the relevant scientific community is forensic examiners and highly trained law enforcement officials, and . . . there[ is] overwhelming general acceptance in that community for the use of Cellebrite."  Based on Detective Coles's testimony and its review of the Daubert factors, the court determined "the detective's testimony about the extraction to be sufficiently reliable" and "that the field is at the state-of-the-art because of the highly developed [Cellebrite] software."

We review "case-specific determinations about the expert evidence—such as whether the witness has sufficient expertise, whether the evidence can assist

the trier of fact in that case, and whether the relevant theory or technique can properly be applied to the facts in issue . . . for an abuse of discretion." Olenowski II, 255 N.J. at 580-81. We are convinced the court correctly determined it was not necessary for Detective Coles to testify as an expert regarding the text messages he extracted by defendant's cell phone.

Generally, "[a] fact witness is one who testifies as to what 'he or she perceived through one or more of the senses[,]'" State v. Miller, 449 N.J. Super. 460, 470 (App. Div. 2017), rev'd on other grounds, 237 N.J. 15 (2019) (quoting State v. McLean, 205 N.J. 438, 460 (2011)), and whose testimony consists of "a description of what the" person "did and saw" based on first-hand knowledge. Ibid. This differs from an expert witness, who testifies based upon "'scientific, technical, or other specialized knowledge . . . that is beyond the understanding of the average person.'" Ibid. (quoting State v. Simms, 224 N.J. 393, 403 (2016)).

Police officers may "testify in a variety of roles." Id. at 470. They may testify as fact witnesses if their testimony "'does not convey information about what the officer "believed," "thought[,]" or "suspected[.]"'" Ibid. (quoting McLean, 205 N.J. at 460). Officers may also testify as lay witnesses where their testimony is "'based on their personal observations and their long experience in

areas where expert testimony might otherwise be deemed necessary.'" Id. at 471 (quoting State v. LaBrutto, 114 N.J. 187, 198 (1989)). For example, in Miller, we concluded that an officer who testified about his investigation of a defendant's laptop, and "merely reported what he found" through his utilization of "peer-to-peer software," testified only in the capacity of a fact witness because he did not provide an opinion on his findings. Ibid.

Our review of the record establishes, as the court correctly determined, Detective Coles could have testified as a lay witness regarding his extraction using the Cellebrite software. His testimony was based on his personal knowledge and experience using Cellebrite software to extract the contents of defendant's cell phone. The transfer of electronic data from one device to another is something well within the ken of the average juror. His testimony did not involve scientific testing or analysis. In fact, he did not offer any type of expert "opinion." He simply testified he used an electronic device to extract text messages from defendant's phone and described where on defendant's phone those files were located. The jury did not need expert testimony to understand the evidence or determine a fact in issue.

We are also convinced, however, the court correctly determined Detective Coles's testimony was reliable and admissible in accordance with the requirements of Olenowski/Daubert. We review the court's determination to admit expert witness testimony based upon Daubert reliability factors de novo. Olenowski II, 255 N.J. at 580-81.

Based on our de novo review, we are persuaded the court correctly applied the Daubert factors and determined Detective Coles's testimony was admissible, particularly as it related to the acceptance of the use of Cellebrite software. The court correctly concluded factor one, whether the Cellebrite software has been tested, was satisfied. As Detective Coles testified, the software has been used around the world for at least a decade to extract information from electronic devices for use as evidence in criminal trials. Such extracted data is used every day in courtrooms throughout New Jersey and elsewhere. See e.g. Pratt, 200 Vt. at 78-80 (affirming admission of Cellebrite extraction evidence in 2013); Villareal-Garcia v. State, 671 S.W.3d 791 (Ct. App. Texas 2023) (affirming admission of Cellebrite extraction evidence).

Factor two was satisfied based on Detective Coles's testimony that the software is certified by the National Institute of Standards and Technology and,

35

as the court noted, the software is regularly tested in court through cross-examination and defense experts.

As to factor three, based on Detective Coles's testimony, to the extent there is any rate of error, it relates only to the time stamp, which can easily be verified and corrected. As applicable to this case, there is no basis to conclude the extracted text messages themselves are subject to any "rate of error." Using the Cellebrite software, the messages are extracted exactly as they are stored on the original device.

Factor four is satisfied based on Detective Coles's testimony that Cellebrite software is generally considered in the law enforcement community to be reliable and accurate and, also, because it is regularly used in criminal proceedings in New Jersey and across the country. The court correctly determined expert testimony regarding cell phone extraction using Cellebrite software is reliable and admissible under the Olenowski/Daubert standard.

Defendant's claim the court improperly admitted the EDR evidence without conducting a Olenowski/Daubert hearing is incorrect. In Olenowski I, our Supreme Court did not disturb "prior rulings that were based on the Frye standard." 253 N.J. at 468. In State v. Shabazz, 400 N.J. Super. 203, 218-219 (Law Div. 2005), the court conducted a Frye hearing and determined "the

scientific reliability of [EDR] evidence was generally accepted within the automotive and accident reconstruction community, and thus met the Frye standards for admissibility." The court properly denied defendant's motion to exclude the EDR evidence in this case.

## VI.

Defendant's arguments that the court's jury instructions were improper lack merit. "An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions." State v. Afanador, 151 N.J. 41, 54 (1997). "Correct jury instructions are 'at the heart of the proper execution of the jury function in a criminal trial.'" Ibid. (quoting State v. Alexander, 136 N.J. 563, 571 (1994)). The trial judge must explain the law as it relates to the facts and issues of the case. State v. Baum, 224 N.J. 147, 159 (2016).

"It is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004). Indeed, every "request must concern legal and factual issues that have been properly raised in the proceedings." State v. Green, 86 N.J. 281, 290 (1981). Further, "[e]very request must state the correct principle of applicable law in a manner that is tailored to the facts of the case

37

and is not misleading." Ibid. "The charge as a whole must be accurate." State v. Singleton, 211 N.J. 157, 182 (2012).

Defendant contends the court should not have instructed the jury that whether or not G.P. was wearing a seatbelt was "not relevant to whether or not defendant caused G.P.'s death." Defendant's argument is incorrect.

In State v. Buckley, 216 N.J. 249, 255 (2013), our Supreme Court held "fact and expert testimony about the victim's failure to wear a seatbelt [in a vehicular homicide case] is irrelevant to both 'but for' causation under N.J.S.A. 2C:2-3(a)(1) and the jury's causation determination under the first prong of N.J.S.A. 2C:2-3(c)'s statutory test – whether defendant was aware that the manner in which he drove posed a risk of a fatal accident." The Court instructed if evidence of failure to wear a seatbelt is admitted, "the trial court must instruct the jury that [the victim's] failure to use a seatbelt is not relevant to 'but for' causation." Id. at 269. It cautioned, however, "the trial court should be careful not to state or imply that it is directing a verdict on the issue of causation." Ibid.

In this case, the State initially requested a Buckley seatbelt charge. The court denied that request because there was no clear evidence G.P. was not wearing a seatbelt. During deliberations, the jury asked if they were "allowed to consider the lack of proof that [G.P.] was wearing a seatbelt and K.E. and

defendant were proven to be wearing a seatbelt."  Based on that note, the court determined it was required to give a <u>Buckley</u> charge.  It instructed the jury:

> The final element the State must prove beyond a reasonable doubt is that the defendant caused G.P.'s death.  You must find that G.P. would not have died but for the defendant's conduct.
>
> Causation has a special meaning under the law.  To establish causation, the State must prove two elements each beyond a reasonable doubt.  First, that but for the defendant's conduct, the victim would not have died.  Second, G.P.'s death must have been within the risk of which the defendant was aware.
>
> In determining causation, it is not for you to consider whether or not G.P. was restrained or wearing a [seatbelt] in the motor vehicle.  The fact of whether or not G.P. was restrained in the vehicle is not relevant to whether or not the defendant caused G.P.'s death.  This, however, does not diminish the State's burden to prove beyond a reasonable doubt that the defendant caused G.P.'s death as I previously instructed you numerous times throughout the jury charge.

The court correctly determined the <u>Buckley</u> charge was required based on the jury's question and the charge it gave was appropriate.

Defendant also contends the court improperly denied his request for an intervening causation charge based on our opinion in <u>State v. Eldridge</u>, 388 N.J. Super. 485 (App. Div. 2006).  Defendant's reliance on <u>Eldridge</u> is misplaced.

In Eldridge, the defendant was convicted of vehicular homicide. Id. at 487. She contended the accident was caused by the actions of her front seat passenger who unexpectedly pushed her head and distracted her, causing her to swerve and hit a tree. Id. at 493. The defendant testified her ability to drive was not impaired and "the accident would not have occurred but for [the passenger] distracting her seconds before the crash." Id. at 493.

We reversed because the court "failed to specifically instruct the jury that it could find the defendant not guilty if it concluded that the actions of [the] front seat passenger constituted an intervening cause of the crash." Id. at 488. We concluded "[t]he 'but for' causation test would exonerate defendant if the jury accepted her testimony concerning [the passenger's] conduct." Id. at 493.

The court correctly denied defendant's request for an intervening cause instruction in this case. Unlike in Eldridge, there was no outside or independent force that caused defendant to leave his lane of travel. He was alone in the car and there was no evidence that anything other than his own actions interfered with his ability to drive. His claim that the jury could have found K.E. caused the accident by swerving into his lane is contradicted by the record. K.E. testified she only left her lane of travel because she saw defendant's vehicle driving straight at her in her lane at eighty miles per hour and she attempted to

avoid the collision. The jury heard overwhelming evidence supporting her version of the accident. There was no intervening cause. Defendant's actions, and his action alone, caused K.E. to swerve in a futile attempt to avoid the accident and ultimately caused the accident.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2899-22